## Case No. 1,948.

### BROOKS v. BYAM et al.

[2 Story, 525;[1] 2 Robb, Pat. Cas. 161.]

Circuit Court, D. Massachusetts. Oct. Term, 1843.

PATENTS—ASSIGNMENT AND LICENSE—RECORDING —CONTRACTS — PERFORMANCE — ENTIRETY—DIVISIBILITY OF LICENSE.

1. A patentee of friction matches, by a deed under seal, undertook as follows: "To grant, bargain, sell, convey, assign, and transfer to B. his executors, administrators, and assigns, the right and privilege, hereinafter mentioned, of making, using, and selling the friction matches," patented, and to have and to hold "the right and privilege of manufacturing the said matches, and to employ in and about the same six persons, and no more, and to vend the said matches in any part of the United States." It was *held*, that this was a license or authority from the patentee, and need not be recorded in the patent office, under the patent act of 1836 [5 Stat. 121], c. 357, § 11.

2. A license need not be recorded in the patent office, unless there be some positive provision of the patent act, which renders it an indispensable prerequisite to its validity.

[Cited in Jones v. Berger, 58 Fed. 1007.]

___

[1] [Reported by William W. Story, Esq.]

3. The recording within three months, according to the statute, is merely directory; and any subsequent recording of an assignment will be sufficient to pass the title to the assignee, except as to intermediate bona fide purchasers, without notice.

[Cited in Olcott v. Hawkins, Case No. 10,480; Perry v. Corning, Id. 11,004.]

4. The patent act of 1836, c. 357, § 11, provides for the recording of three kinds of assignments, and of no others: first, an assignment of the whole patent; secondly, an assignment of any undivided part thereof; and, thirdly, a grant or conveyance of the exclusive right under the patent within any specified part of the United States. It was *held*, that the right granted by the above deed was a license or authority, coupled with an interest in the execution, to the grantee and six persons to be employed by him in making matches; that the right was an entirety, incapable of being apportioned or divided among different persons; that, therefore, an assignment by B. of a right to make as many matches as one person could roll up, was void.

[Cited in Blanchard v. Eldridge, Case No. 1,510; Gibson v. Cook, Id. 5,393; Baldwin v. Sibley, Id. 805; Perry v. Corning, Id. 11,004; Chambers v. Smith, Id. 2,582; Farrington v. Gregory, Id. 4,688. Followed in Consolidated Fruit-Jar Co. v. Whitney, Id. 3,132. Distinguished in Adams v. Howard, 22 Fed. 658; Brush Electric Co. v. California Electric Light Co., 3 C. C. A. 368, 52 Fed. 964.]

5. Quaere, if the license is not such a personal privilege, that the entirety cannot be assigned, notwithstanding it was given to B. and his assigns.

[Cited in Racine Seeder Co. v. Joliet Wire-Check Power Co., 27 Fed. 376.]

[See Belding v. Turner, Case No. 1,243, note.]

6. The general rule of the common law is, that contracts are not apportionable; and this rule seems ordinarily, though not universally true, where the apportionment is by the act of the party, and not by mere operation of law; or where the contract is only in part performed, and is not in its own nature severable.

7. Quaere, if by the maritime law the contract in the case of Cutter v. Powell, 6 Term R. 320, was not divisible.

8. No apportionment or division of a license or privilege can be made, if it be contrary to the true intent of the parties thereto.

9. Quaere, if an owner grant to A. the privilege of cutting timber off his land, with the assistance of four men employed by him, can A. sell the license and right of employment to the extent of one man's share?

10. An authority to A. cannot be assigned or executed by B. A fortiori, it is not apportionable, so that a part may be executed by B., and a part by C., and a part by D., and the residue by A.

Bill in equity [by William Brooks against Ezekiel Byam and others to restrain prosecution of a suit at law] for an injunction and for relief. [Dismissed.] This is the same case which has already been before the court on an interlocutory motion [on exceptions taken by plaintiff to the answer of defendant Prentiss Whitney]. 1 Story, 296 [Case No. 1,947]. It also relates to the same patent which formed the subject of inquiry in Ryan (Byam) v. Goodwin [Case No. 12,186]. The bill states that one Alonzo D. Phillips obtained letters patent [dated October 24, 1836, and numbered 68] for the making of friction matches; that he sold six rights therein, that is, the right to employ six persons at the same time, in the manufacture of the said matches, to one John Brown; and that Brown sold one such right to the plaintiff; but that the deeds of conveyance, both to Brown and the plaintiff, were not recorded in the patent office. It also states that the defendants, claiming to be the sole assignees of Phillips, by a deed of conveyance, bearing date July 20th, 1838, from him to Byam, and from Byam to the other defendants, but of later date than the deed to the plaintiff, had commenced a suit against him, in the circuit court of the United States, for the district of Massachusetts, for an alleged invasion of their said right; the plaintiff averring, that he has done nothing therein not granted to him by the deeds from Phillips to Brown, and from Brown to him. The bill further alleged, that at the time of the assignment from Phillips to Byam, and before delivery of the deed, the said Byam and the other defendants, knew, or had good cause to know, of the said conveyances from Phillips to Brown, and from Brown to the plaintiff. Evidence was taken, tending to show knowledge on the part of the defendants, as alleged in the bill; but the case was argued on other grounds.

The following are the conveyances from Phillips to Brown, and from Brown to Brooks, the plaintiff:

"Copy of Assignment from John Brown to William Brooks.—An agreement made this eighteenth day of September, A. D. 1837, by and between John Brown, of Fitchburg, of the one part, and William Brooks, of Ashburnham, of the other part. Witnesseth, that the said Brown, in consideration hereinafter mentioned, agrees to sell and convey unto the said Brooks a right of manufacturing friction matches according to letters patent granted to Phillips and Chapin of Springfield, in said town of Ashburnham, to the amount of one right, embracing one person only so denominated in as full and ample a manner to the extension of the said one right, as the original patentee. And the said Brown further agrees, to go to Ashburnham and assist the said Brooks in learning the art and mystery of manufacturing said friction matches for the term of two days, and also to furnish from his, the said Brown's establishment in Fitchburg, one girl, acquainted with said manufactory, to instruct other girls in said Brooks's employment in the said art and mystery of folding and binding up said matches, for the term of two weeks. Also the said Brown further agrees with said Brooks, not to sell any right of manufacturing said friction matches, or of vending the same to any person living or intending to manufacture or vend said matches within forty miles of said Ashburnham. And the said Brooks, on his part, agrees with said Brown, upon condition that the

said Brown keeps and truly observes all and each of his agreements aforesaid, to pay him, the said Brown, the sum of fifty dollars in six months from this date. And it is mutually agreed between the parties, that if it should turn out, upon legal investigation, which is now in progress, that said Phillips's and Chapin's patent right is invalid and of no effect in law, then said Brooks is not to pay said Brown any part of the said sum of fifty dollars, but only the reasonable expenses for the services of the said Brown, and the girl, for the term aforesaid. John Brown. William Brooks.

"Witness: Edmund Sanderson. Joseph Merriam.

"September (——,) 1837. Renewed the said Brooks's note for the sum of twenty-five dollars to this agreement.

"Patent Office.—Received and recorded, Liber D. of Transfers of Patent Rights, page 96. July 15th, 1839. Henry L. Ellsworth, Commissioner of Patents.

"Copy of Assignment of Phillips and Brown.—Know all men by these presents, that I, Alonzo D. Phillips of Springfield in the county of Hampden and commonwealth of Massachusetts, in consideration of three hundred dollars to me paid by John Brown of Warren, in the county of Merrimac and state of New Hampshire, the receipt whereof I do hereby acknowledge, have granted, bargained, sold and conveyed, and do by these presents for myself, my executors and administrators grant, bargain, sell, convey, assign and transfer to him the said Brown, his executors, administrators and assigns, the right and privilege hereinafter mentioned of making, using and selling the 'friction matches,' an invention of the said Phillips, and patented to him by letters patent of the United States, bearing date October 24, 1836, for the term of fourteen years. To have and to hold to him the said Brown, his executors, administrators and assigns, as fully as I can or may, by virtue of said letters patent, the right and privilege of manufacturing the said matches, and to employ in and about the same six persons and no more, and to vend said matches in any part of the United States. And I do covenant and agree with the said Brown, that I have full power and lawful authority to convey the said right and privilege, and will warrant and defend the same, for the purposes aforesaid. Provided, however, that nothing herein contained shall prevent or restrict me from making and vending the same or of selling and conveying similar rights and privileges to others. Provided also, that the said Brown shall not manufacture the said matches in any place within forty miles of Methuen. In witness whereof I have hereunto set my hand and seal this 2d day of January, A. D. 1827. Alonzo D. Phillips. [L. S.]

"Signed, sealed and delivered in presence of Rhodolphus Kinsly. Artema Rogers."

"Hampden, ss. January 2d, A. D. 1836.—Personally appeared the above Alonzo D. Phillips and acknowledged the foregoing instrument to be his free act and deed. Before me, R. E. Bemis, Justice of the Peace.

"Patent Office.—Received and recorded. Liber D. of Transfers of Patent Rights, page 89. July 15, 1839. Henry L. Ellsworth, Commissioner of Patents."

It will be observed that these were not recorded until some time subsequent to the conveyance to Byam. The cause being set down for a hearing upon the bill, answers, and evidence in the cause, was argued by C. Sumner and Greenleaf for the plaintiff, and by E. Smith and Dexter for the defendants. The first question that was presented, was whether it was requisite to the validity of the deeds from Phillips to Brown, and from Brown to Phillips, that they should be recorded in the patent office.

Sumner, for plaintiffs, argued, that recording is not required by the common law, or any general principles of law. It is of statute origin: and we are, therefore, to look to the legislation on the subject of patents, to ascertain if there be any requisition applicable to these deeds. He then reviewed all the patent laws of the United States, those obsolete, as well as those in force, to show that the recording of a mere license under a patent, had never been required.

Dexter, for defendants, said he should not contend that it was necessary that the license assigned by the patentee, Phillips to Brown, or by Brown to Brooks, should be recorded in the patent office. But he argued, that the assignment by Brown to Brooks was utterly void, because the license to Brooks by the patentee was an entirety, and incapable of being divided. It was transmissible, but not apportionable.

THE COURT then requested Sumner and Greenleaf to confine their argument to this last point.

The argument for the plaintiff was as follows: The ancient rule of the common law was, that a contract could not be apportioned. The reason of this was expressed by Holt, C. J., in Hawkins v. Cardee, 1 Salk. 65, where he said: "Where a man's contract has subjected him only to one action, it cannot be divided, so as to subject him to two." Finch says: "The duty growing upon a contract cannot be apportioned." See Finch, Law, bk. 2, c. 18. The rule seems to have been of the same class with the rule prohibiting the assignment of a chose of action; and also prohibiting maintenance. Both of these, in various ways, have lost much of their original stringency. Choses in action, through the intervention of equity, are now assignable; and the commissioners for the reform of the criminal law in England, in their seventh report, recently offered, class maintenance among the offences, "the policy of retaining which is at least doubtful." Law Mag. No. 61, p. 3.

The same policy, which has gradually restrained the ancient rules in the two last cases, would bear in restraint of the rule against the apportionment of a contract. But even in the earliest times this rule was very much restrained, or rather, received a very limited application.

Let us consider first the cases to which the rule was applied. Apportionment did not take place in the following cases: (1) Debt. Brooke, Abr. "Apportionment," pl. 17; 3 Vin. Abr. "Apportionment," A, § 7. (2) Contract. Id. § 11. (3) Obligation. Id. § 10. These three instances are only expressions of the rule we are considering. (4) Rent-charge. Id. § 1. (5) Rent-seck. Id. § 2. The last two instances are where there was an obligation, debt, or contract, so that in principle they are like the others. (6) A condition cannot be apportioned except by act of law. Id. § 17. (7) A relief. Id. § 18. (8) An assent. Id. § 5. Both of these last are technical, and applicable the first to feuds, and the second to attornments. (9) An authority (as of a sheriff to his undersheriff not to meddle with executions beyond such a sum,) cannot be apportioned. Norton v. Simmes, Hob. 13; 3 Vin. Abr. "Apportionment," § 25. This case might be extended to all offices, which implied a personal confidence.

Let us now consider the cases where apportionment has been allowed. And here we remark one element common to these cases, viz.: that wherever the right in question is in the nature of property, in contradistinction to a mere chose in action, it may be apportioned.

1. Common appurtenant to land for cattle, levant and couchant, by grant shall be apportioned, if part of the land is granted over to another. Danv. Abr. p. 504. This principle was established in a case in Hob. 235a, where it was adjudged, that, where one had a common appurtenant to ten acres of land, &c. and sold part of it, that the common should be apportioned, and every one should have common for his beasts, levant and couchant, upon his part; for these are things entire in several degrees; save that it cannot be divided by any act of the parties, as warranty, conditions, and such other, which yet by act in law are divided. But the case of common is not so strict an entirety; and the mischief of generality of the case requires an extension for the general good. Another instance where common was apportioned is in Danv. Abr. "Apportionment," B, § 19: "If a man prescribes to have common for two yard-lands for four beasts, four horses, and sixty sheep, &c., and after he leases for years one of the yard-lands, the lessee shall have common, pro rata." The principle of the apportionment in this case seems like that, which should govern the license from Brown to Brooks, to exercise a right to the extent of what one girl could roll up. The right to the whole common for the two yard-lands was not conveyed, but only such a right as was attached to one yard-land. Another instance, which is in the nature of common, is in 3 Vin. Abr. "Apportionment," A, § 22: "Fold-course appurtenant to a manor for 300 sheep in 70 acres, &c. may be well divided," &c. Another instance in Danv. Abr. "Apportionment," B, § 18: "If a man seized of 60 acres of land prescribes to have common in other land for all his cattle levant and couchant thereupon, and he makes a feoffment in fee of five of these acres, his feoffee shall have common proportionably, pro rata."

2. Rent. We have seen, that certain kinds of rent could not be apportioned. But the disposition to break in upon the rigor of the rule has been very strong. It will not be necessary to go over all the cases where rent has been apportioned. "If there be lord and tenant of 20 acres by fealty, and 10 shillings rent, and the tenant aliens two acres in fee, the alienee shall hold the two acres, &c. and the rent shall be apportioned according to the value." Id. § 1. "If the king's tenant leases for years, rendering rent, and after grants the reversion of two parts to another, and dies, and his heir is in ward for the third part of the reversion, which descendant and the king grants the third part over, the grantee shall have an action of debt for the third part of the rent; for it shall be apportioned." 3 Vin. Abr. "Apportionment," B, § 3. "If lessee for 20 years leases for 10 years, rendering £34. 6s. 8d., and after devises 20s. of this rent to three persons, to hold to each of them one third part divided, and dies, this rent shall be apportioned according to the devise, and each devisee may have an action of debt against the lessee for his part, viz.: 6s. 8d. though hereby the lessee may be charged in several actions." Danv. Abr. "Apportionment," B, § 4; 3 Vin. Abr. "Apportionment," B, § 4. See also Fitzh. Nat. Brev. 235. "If one have a rent-service of money, or corn, or pepper, &c. issuing out of land, and purchase part of it in fee, the whole rent is not extinct, but shall be apportioned juxta valorem terrae; and so also it is of other services, if they be dividible, but if they be entire and valuable, as a horse, or the like, then they be gone and extinct." Shep. Abr. "Apportionment," c. 14, p. 100.

3. Services shall be apportioned upon disseisin. 3 Vin. Abr. "Apportionment," § 4. The case in 8 Edw. III. Year Book, I have not been able to find. An exception to this is with regard to suit of court, which is not apportionable. Shep. Abr. p. 103, "Apportionment." And they shall be apportioned even without disseisin. "Where a man is bound to repair a bridge by reason of his land, and aliens part of it, he shall be rated according to the portion." 3 Vin. Abr. "Apportionment," A, § 9. A writ in this case is given in Fitzh. Nat. Brev. p. 235.

4. Tithes. "Money, payable for tithes by composition or sale of part of the land, shall be apportioned; and each purchaser shall pay his share," &c. 3 Vin. Abr. "Apportionment." A, § 19.

5. Power. "A power is apportionable; but a seignory or condition is not," &c. Edwards v. Sleater, Hardr. 416; 3 Vin. Abr. "Apportionment," A, § 25.

It would seem, from this survey of the cases on the subject of apportionment, that the courts have endeavored to extricate themselves as much as possible from the rule. The ancient cases have been invaded by many exceptions; and even the rule with regard to contracts has only a modified application now, compared with what it once had.

There is another principle which bears on this subject; the rule that a contract could not be apportioned, is a rule of the common law, and is not to be extended beyond the proper influence of this jurisprudence. There are some ingenious remarks by Mr. Hammond, in his Nisi Prius, (page 409, note, "Replevin," c. 3, pl. 6), which illustrate this: "Rent reserved upon a tenure (he says) is apportionable by act of contracting parties; because the first is the offspring of the feudal system, and, therefore, amenable to its rules only; the other, the creature of our own common law, and, therefore, subject to the maxim that, a contract cannot, but by act of law, be divided."

Let us now apply the result of these authorities to the deed from Brown to Brooks. In the first place, this deed does not concern any interest known to the ancient common law; it is not a contract in the view of the old law. It is evidence of property; or, to use the language of the deed, it is a "right and privilege," under the patent law of the United States; a system of legislation more distinct from the common law than the feudal law, which, according to Mr. Hammond, was a distinct system. This consideration serves to remove the question from the immediate stress of the ancient rule. But, in the second place, it is not only under rules different from those of the common law; but it does not come within any of the things to which this old rule has been applied. It is not a debt; nor a contract; nor an obligation; nor a rent-charge; nor a rent-seck; nor a condition; nor a relief; nor an assent; nor an authority (according to the acceptance of this word in the old cases). It is a certain interest under the patent laws: an interest first provided for expressly by the act of congress, April 10th, 1790, c. 34 [2 Bior. & D. Laws, 90; 1 Stat. 111, c. 7], § 4. It has been called a license, and, in some senses, may be regarded as such. But if a simple machine, that has been patented, should be conveyed to a person, this conveyance comes with an implied license to use the same; and the machine with the license would be valuable as property. Such is the character of the "right and privilege" in the present case, to make matches. It is property. As property, it is not touched by any of the ancient cases, which are adduced as authorities against its division or apportionment. But, further, it is in its nature "dividible;" and this of itself is a reason, according to Shepperd's Epitome, p. 100, for allowing the division. It is a right to make as many matches as six girls can roll up; if it were to make as many as one girl could roll up, it might well be doubted whether it was "dividible;" but one sixth of the original right is, at once, a fractional part of that right, and a unit in itself. It is like a rent-service of six horses, which would be "dividible." To this reasoning it is objected, that, by this division, the original patentee would be put to the trouble of watching six persons, instead of one, and that this should not be imposed on him. But, it is submitted that, in point of fact, no greater trouble will be imposed on him than he has already assumed. It seems to be admitted, that Brown might send his six girls to six different sections of the country, each girl carrying on in her section a separate establishment. Here would be six establishments for the patentee to watch. The only difference asserted between such a case and that now before the court, is, that in the one case, Brown, the original assignee, would be primarily liable for any misuser of the right; whereas, in the present case, the patentee would be driven to look to the several parties to whom the right had been conveyed. But this difference in reality is very slight; it is what Lord Eldon would have called "very thin." But suppose this additional trouble of watching six persons, instead of one, is imposed by the division, it is confidently submitted that, in point of strict law, this would not prevent the division. The case in Danv. Abr. "Apportionment," B, § 4, was where an apportionment was allowed, "though thereby the lessee might be charged in several actions." The cases, with regard to apportionment of common, all recognise the same principle. In all these, the trouble is imposed upon the parties interested in the common to watch a larger number of persons. The other cases, already cited, where apportionment has been allowed, as of rent, &c. all involve the same "trouble," multiplied by every division. And yet these cases were decided in the early periods of our law, when the rule against apportionment was regarded with more favor than at present.

Another consideration remains, whether there is any thing in this so-called "license," which is personal, and, in its nature, not to be assigned. In determining this, we are to look again at the laws, from which it draws its origin—the patent laws. The license to make matches is a sale of the "right and privilege" to make matches: it being a certain interest under the patent, which, ac-

cording to the spirit of the patent laws, is saleable. In its character, it does not differ from the sale of a patented machine, as of a pump, which carries with it a license to use. But has any one ever contended, that a patented pump may not be sold and resold, as often as the owners of it may desire? No sale is personal. An article once sold is given to the world. The very language of the deed from Phillips to Brown is in confirmation of this view. The words of grant are the strongest known to our law. The language denotes, that it was considered property, and not a mere chose in action. It is essential, that all the words employed should have an operative meaning. The law does not, of itself, strike out words, which the parties have introduced. It construes an instrument so as to give reasonable effect to all the words; "ut res magis valeat quam pereat." Lord Bacon has expressed the rule on this subject in distinct words. "Verba aliquid operari debent, verba cum effectu sunt accipienda." Maxims Law, Reg. III. But if it should be doubted whether effect is to be given to this word "assigns," and further, whether the deed is capable of division, then we rely upon another rule of interpretation, which is adapted to a case like this. "Verba fortius accipiuntur contra proferentem." Lord Bacon has clearly pointed out the reason of this rule, and the cases, which will justify its application. Id.

The argument for the defendants was as follows: It is a mistake to call this "property" in any sense, which is decisive of the question. It is not an assignment of any part of the patent right, as the grant of it in no degree abridges the remaining right in the hands of the patentee. It is not classed among assignments in the patent act. It needs not to be recorded, and the licentiate can maintain no action in his own name. It is a valuable right, and in no other sense is it property; but rights are not dividible, because they are valuable. It is strictly a permission to do that which none but the patentee can do without his consent. The right to make, does not imply the right to sell that privilege, much less to sell six privileges, where only one was granted. Such is not the compact made between the parties: it is an executory contract, or, at least, a continuing contract, and not in the nature of a grant of property. Property, once conveyed, without any peculiar restriction, is as completely at the disposition of the grantee, as it was at that of the grantor; but that right, which consists in the liberty of continuing to do a thing, must be taken and used as it is given. The grantee of the power cannot vary or add to the terms of the contract. The case falls precisely within that class of "authorities" which, according to the cases cited on the other side, cannot be apportioned. The authority given by a sheriff to his deputy, according to the case in Hobart, is not more strictly a new authority than that of a license by a patentee, which conveys to the grantee no portion of that exclusive right, which the patentee derives from his patent. It is asked whether the vendee of a patented machine may not sell it with the implied right of using it. Certainly he may: because the machine is property, in the strict sense of the word; and the right of using it is but appurtenant to the possession. Upon a similar distinction proceeds that class of cases, in which the right of common is held to be divisible, because it is appurtenant to land, which is itself divisible, and so the man, who bought six patent machines, bought therewith the right of use appurtenant to each, and could, therefore, sell them each with the right annexed.

If I may be permitted to use the expression, the fallacy of the argument on the other side consists in treating this contract as a sale of as many matches as six girls can roll up; thereby making the right of manufacturing a mere appurtenant to the principal grant; like the cases put of a sale of as many bricks from a yard as two horses can haul, &c. In all these cases it is a sale of clay, timber, or wood, with a right to take it from the vendor's land, and this brings them within the reason of the cases of common rent, and other things issuing out of land, where the principal thing is a divisible property, and the appurtenance follows the principal; but the present case contains no contract of sale of the matches, nor of any of the materials, of which they are composed; it is simply a license to Brown to take his own wood, phosphorus, chalk, glue, and brimstone, and make them up into matches according to the vendor's patent; it is a mere power, coupled indeed with an interest, and, therefore, not revocable. There is something of a personal trust in the contract, as the vendor might prefer to trust one man rather than another with a power so likely to be abused. Perhaps the use of the word assigns in the deed, though of no force at law, if the thing be not assignable, might protect an assignee of the whole in equity. But it is unnecessary to pursue this inquiry, because there are no words in the deed contemplating a division. It is not agreed, that by a fair interpretation of the license, Brown could establish six manufactories in six different places. The license provides that Brown shall not manufacture in any place within forty miles of Methuen. This shows the place of manufacture was thought of some importance, although the right is given to vend in any part of the United States; but supposing such a right to exist, it is by no means true, that the same inconvenience would follow from it to the patentee, as from the establishment of six independent manufactories. The patentee would thereby lose the responsibility of the person with whom he contracted for the conduct of his subordinates, though per-

haps the same evil to a less extent might result from the general assignability of the contract.

But no answer has been given to the more weighty objection urged at the bar, and that is, that by this subdivision six competitors with the patentee are brought into the market in stead of one, each with the power, and under the obvious temptation, to undersell the other in a manufacture, in which the materials cost almost nothing, the consumption is almost unlimited, and the profit very great. We think this decisive, and that Mr. Phillips and his assignee may well say that they have made no such contract with Brown. As to the point, that if Brooks took no legal title he ought, at least, to be protected as an equitable assignee, it is obvious that this constuction would leave the patentee and his assignees exposed to all the disadvantages of a legal title in Brooks. The cases of Dunlap v. Stetson [Case No. 4,164], and Moody v. Towle, 5 Greenl. 415, cannot be applied to this; for in those cases the thing divided was of a divisible nature, although the note, the evidence of the debt, was not.

The following cases were cited by the counsel for the defendant: Robson v. Drummond, 2 Barn. & Adol. 303; Planche v. Coburn, 5 Car. & P. 58, 8 Bing. 14; Hall v. Gardner, 1 Mass. 172; Davis v. Coburn, 8 Mass. 299.

STORY, Circuit Justice. The question, which seems originally to have been one of the main hinges of this controversy, and to which, as a matter of fact, so much of the evidence is addressed, is, whether Byam, at the time of the purchase of the patent right of Phillips, which was subsequent to the license granted by the patentee to Brown, had notice of the license so granted to Brown. That point becomes wholly immaterial, if the license itself is not by law required to be recorded. And independent of the admission of counsel, I am entirely satisfied, upon the true construction of the patent act of 1836 [5 Stat. 121], c. 357, § 11, that such a license is not required by law to be recorded in the patent office, in order to give it effect and validity. In this view of the matter, I adopt throughout the argument of the learned counsel, who opened the cause for the plaintiff. My reasoning upon the point is briefly this. The license is not per se required to be recorded, unless there be some positive provision of the patent act, which renders it an indispensable prerequisite to its validity and obligation. There is no other act in force, requiring any assignment of any patent right to be recorded, except the act of 1836; and the eleventh section of that act is in these words: "That every patent shall be assignable in law, either as to the whole interest, or any undivided part thereof, by any instrument in writing; which assignment, and also ev-

ery grant and conveyance of the exclusive right under any patent to make and use, and grant to others to make and use, the thing patented within and throughout any specified part or portion of the United States, shall be recorded in the patent office within three months from the execution thereof, for which the assignee or grantee shall pay to the commissioner the sum of three dollars." I have already, in other cases, had occasion to decide that the recording within three months is merely directory, and that, except as to intermediate bona fide purchasers, without notice, any subsequent recording of an assignment will be sufficient to pass the title to the assignee. Now, as has been well observed by the counsel for the plaintiff, three cases only of the recording of assignments are provided for in the foregoing section; first, an assignment of the whole patent; secondly, an assignment of any undivided part thereof; and, thirdly, a grant or conveyance of the exclusive right under the patent within any specified part or portion of the United States. The present case falls not within either predicament. It is not a grant of any exclusive right; but at most the grant of a right or privilege of manufacturing matches under the patent in any place not within forty miles of Methuen, and to vend them in any part of the United States, concurrently with the patentee and any other grantees under him. It is, in no sense, therefore, an exclusive right. It is not an assignment of the patent itself, or of any undivided part thereof, or of any right therein limited to a particular locality. In truth, in propriety of language, it is strictly a license or authority from the patentee to Brown to make and vend the matches, without giving him any exclusive right except as to the matches he shall manufacture, exactly as the sale of a patented machine by the patentee would give to the purchaser the right to use the same, without in any manner restricting the patentee in his right to grant or sell other similar machines to any other persons for use. The language of the instrument of conveyance to Brown by the patentee, is that he doth "grant, bargain, sell, convey, assign, and transfer to him, the said Brown, his executors, administrators, and assigns, the right and privilege hereinafter mentioned of making, using, and selling the friction matches" patented, and to have and to hold "the right and privilege of manufacturing the said matches, and to employ in and about the same six persons, and no more, and to vend said matches in any part of the United States." Then comes the proviso, that nothing herein contained shall prevent or restrict the patentee from "making and vending the same, or of selling and conveying similar rights and privileges to others;" and a further proviso, that "the said Brown shall not manufacture the said matches in any place within forty miles of Methuen." It seems to me, that this language

admits of no other rational interpretation, than that, which I have already put upon it. My judgment accordingly is, that no re-cording of this instrument was necessary to give it complete validity; and therefore the question of notice thereof by Byam, at the time of his purchase, becomes unnecessary to be decided.

The other question as to the indivisibility of the license, granted to Brown, involves considerations of more nicety and difficulty. By the agreement between Brown and Brooks (18th of September, 1837), it was agreed by Brown to sell and convey unto Brooks "a right of manufacturing friction matches according to letters patent, granted to Phillips, &c. in the said town of Ashburn-ham, to the amount of one right, embracing one person only, so denominated, in as full and ample manner to the extension of the said one right as the original patentee;" and Brown further agrees "to go to Ashburn-ham and assist Brooks in learning the art and mystery of manufacturing such friction matches, &c. &c.;" and, also, "not to sell any right of manufacturing said friction matches, or of vending the same to any per-son living, or intending to live, to manufac-ture or vend said matches within forty miles of said Ashburnham." The question, then, is, whether the license or privilege granted by the patentee to Brown is not an entirety, and incapable of being split up into distinct rights, each of which might be assigned to different persons in severalty. I do not med-dle with another point, and that is, whether the entirety of the license or privilege to Brown was capable of being assigned, though if it were intended to be a personal privilege or license, it might open a ground for argument, notwithstanding the use of the word "assigns." That point does not arise in the present case; for here the whole license or privilege is not sold or assigned; but one right, embracing one person only. It has been well said that the right or license may be transmissible, although not appor-tionable. There is some obscurity in the language of the instrument, which makes it somewhat difficult to give a definite inter-pretation to it. Brown's privilege or license is at most to himself and his assigns, and "to employ in and about the manufacturing of the matches six persons, and no more." Brown agrees to sell to Brooks "one right, embracing one person." Now, the privilege or license to Brown (assuming it to be capa-ble of assignment) is to him, and to his as-signs, to employ six persons. Whoever is employed is to be employed by Brown and his assigns. It would seem to be a reason-able interpretation of this language to say, that all of these persons should be employed by one and the same party, either all by Brown, or all by his assigns. But the sub-agreement with Brooks conveys to him one right in severalty, embracing one person, that is, (as I understand it,) the right to em-ploy one person in the manufacture of the matches. So that if this agreement be valid, then the original privilege or license, grant-ed by the patentee to Brown, upon this con-struction, includes six distinct and independ-ent rights, each of which may be granted to a different person in severalty. Now, I must confess, that such a construction is open to all the objections stated at the bar. It exposes the patentee to the competition of six different distinct persons, acting in severalty, and independently of each other. It may make an essential difference to the patentee in his own sales, whether the whole of the right or privilege granted to Brown be in the possession of one, or more persons, having a joint interest, and of several per-sons, each having a separate and independ-ent interest. The danger too to the paten-tee of an abuse or excess of the right or privilege granted by him is materially en-hanced by the circumstance, that each of the sub-holders may be acting at different places at the same time, and the nature and extent of their claim and use of the right or privi-lege may be difficult for him to ascertain, and leave him without any adequate remedy for any such excess or abuse of it. The lan-guage ought, in my judgment, to be ex-ceedingly clear, that should lead a court to construe an instrument of this sort, grant-ing a single right or privilege to a par-ticular person or his assigns, as also grant-ing a right or license to split up the same right into fragments among many persons in severalty, and thus to make it appor-tionable as well as transmissible. The patentee might well agree to convey a single right as an entirety to one person to manufacture the matches and employ a fixed number of persons under him, when he might be wholly opposed to apportioning the same right in severalty among many per-sons. I observe, that the parties are ad-mitted, both by the evidence and at the bar, to have adopted, and to be willing to abide by, a construction of the grant to Brown, which I confess, I should hardly have ar-rived at by an examination of the words of the instrument. That construction is, that the grant to Brown, was to manufacture as many matches as six girls could roll up in a day; and that as many other persons might be employed by him to prepare the work, as might be necessary to accomplish this end. See Printed Record, pp. 20, 64, 125. But the employment of six girls by one or more persons holding the entire right, might be very different in the effect upon the value of other rights, grantable by the pat-entee, from what it would or might be, if there were six separate owners, each enti-tled to employ one girl, with all the proper auxiliaries.

There are many rights and privileges which are grantable, but which, at the same time, are not assignable. And the rules on this head are founded, sometimes upon the con-

sideration of the nature and objects of the grant, and sometimes upon a supposed personal confidence, and sometimes upon the apparent inconvenience of allowing an assignment. Some of the cases on this subject will be found collected in Com. Dig. "Grant," D, and "Assignment," C, 1. Even transmissible rights are not always severable or apportionable. Of this, several illustrations may be found in Co. Litt. 164b, 165a, and Com. Dig. "Parcener," A, 2. But what is more immediately to our present purpose, there are many rights, which, although assignable as an entirety, are not apportionable or divisible by assignment. Thus, for example, it is said in Com. Dig. "Grant," D, that if A. hold three acres by fealty and rent, and the lord grant the services of one of the acres, it is void; for he cannot make severance of the tenure. And the same doctrine is laid down by Perk. "Grant," 67, and by Littleton, J., in the Year Book 7 Edw. IV. 25. The like rule is laid down in Com. Dig. "Grant," D, and in Perk. "Grant," 68, where three jointments hold, and the lord grants the services of one of them unto a stranger; for the grant is void for the like reason. But the case of Lord Mountjoy, reported in Godb. 17, Moore, 174, and more fully upon the same points in And. 307, approaches by a very near analogy to the present case. There, Lord Mountjoy granted by indenture a certain manor to one Browne in fee, and there was a proviso in the indenture, and a covenant by Browne, that Lord Mountjoy, his heirs, and assigns, might dig for ore in the lands parcel of the manor, and dig turf also, for the purpose of making alum. Lord Mountjoy demised his interest for a term of years to one L., and L. assigned over the same to two other persons; and among other questions, one was, whether Lord Mountjoy could assign over this right, and if the subsequent assignment to the two were good. Godbolt says, that it was decided by the judges, that the assignment to the two was good; but that the two assignees could not work severally, but together with one stock, or such workmen as belonged to them both. Lord Coke, who was counsel in the case for Lord Mountjoy, and who reported to the privy council, where the question arose, the opinion of the judges, confirms in Co. Litt. 165a, the report of Godbolt, and says, that the judges, among other things, resolved, "That the Lord Mountjoy might assign his whole interest to one, two, or more; but then, if there be two or more, they could make no division of it, but work together with one stock; neither could the Lord Mountjoy, &c. assign his interest in any part of the waste to one or more, for that might work a prejudice and a surcharge to the tenant of the land." And, therefore, Lord Coke adds, if such an uncertain inheritance descendeth to two partners, it cannot be divided between them. It is true (as Mr. Butler in his note, Co. Litt. 165a, note 1, has

observed) that Lord Anderson's report takes no notice of the point of indivisibility, nor is it contained in the certificate, there stated to have been given by the judges. But that is quite consistent with Lord Coke's account of the matter, which does not merely refer to the certificate, but to the reasoning of the judges; and the point of indivisibility was certainly fairly open before the judges, in considering the subject. Lord Coke, from his position in the case, could scarcely have been mistaken upon so important a point, which went to limit, and not to enlarge, the rights of his client. Now, it seems to me, that, in this aspect, the case of Lord Mountjoy has a very striking application to the present case. The grant was of a mere right to dig ore, &c.; and yet upon the ground of possible or probable prejudice to the grantor (Browne) of this privilege, it was held to be indivisible.

A great many cases were cited at the argument by the learned counsel for the plaintiff, turning upon the general doctrine of apportionment, and the analogies furnished thereby to illustrate the present case. Some of those cases are exceedingly obscure. Others turn altogether upon principles of the feudal law, applicable to rent service, and other kindred tenures, since the statute of quia emptores. See Vin. Abr. "Apportionment," B, § 1; Bac. Abr. "Rent," M, 1. Others again are cases of very doubtful authority, such as Ards v. Watkin, Cro. Eliz. 637, 651, where the court were at first divided, and Popham, Chief Justice, dissented from the final opinion. And others, again, turn upon apportionments by operation of law, and independent of the acts of the parties. The general rule of the common law is, that contracts are not apportionable; and this rule seems ordinarily, although not universally, true, where the apportionment is by the act of the party, and not by mere operation of law; or where the contract is only in part performed, and is not in its own nature and terms severable. See 1 Story, Eq. Jur. §§ 471, 472, 476, 480, 481. The case of Cutter v. Powell, 6 Term R. 320, is directly in point, although I entertain considerable doubt, whether, by the maritime law, the contract in that case was not divisible. In respect to rent, there are doubtless, many cases, where, at the common law, it is apportionable by operation of law, when it could not be by the act of the parties. Co. Litt. 147b–149b; Bac. Abr. "Rent," M; Wotton v. Shirt, Cro. Eliz. 742; Vin. Abr. "Apportionment," B. And in some cases also it may be apportioned even by the act of the party entitled thereto, as is shown in the cases put in Bac. Abr. "Rent," M, 1. See, also, Vin. Abr. "Apportionment," B. But the grounds, upon which this is supported, are not always clearly stated or defined, or made consistent with each other. Thus, it is there said, that if I make a lease of three acres, reserving 3s. rent, as I may dispose of the whole reversion, so I may also of any

part of it, since it is a thing in its own nature severable, and the rent, as incident to the reversion, may be divided too. This is intelligible enough; but then it turns upon the very ground, that a reversion is severable; and the very question raised in the case now before the court is, whether this license is so severable or divisible. It is upon the like reason, that the case of Ards v. Watkin, Cro. Eliz. 637, 651, is there attempted to be supported. In Ewer v. Moyle, Id. 771, the court found great difficulty in allowing an apportionment of rent, where there had been a devise, and finally adjudged, "that there should be an apportionment, in regard it was not a division by the act of the party, but by the law, viz. the statute of wills;" which seems a strange reason for the case, as the devise was clearly the act of the party. In Bac. Abr. "Rent," M, 1, it is said, that the law allowed of grants of rent-charge, and thereby established such sort of property, and it would be unreasonable and severe to hinder the proprietor to make proper distribution for the promotion of his children, or to provide for the contingencies of his family, which were in his view. If this be a good reason, it would carry the doctrine of apportionment to a vast many other cases, which it has never been supposed to reach. The case in Hobart's Rep. 235, where it was adjudged, that where one had a common appurtenant to ten acres of land for all his beasts levant and couchant on the land, and sold part of it, the common was apportionable, and every one should have common for his beast levant and couchant upon his part, turned upon the ground that the right of common there was several in its nature, and is not so strict an entirety, as a warranty, a condition, &c., which cannot be divided by the act of the parties, which yet by act of law are divided. The same doctrine was applied in the case cited from Danv. Abr. "Apportionment," B, 4, and to be found also in Vin. Abr. "Apportionment," B, § 19, and reported as the case of Morse v. Well, in 1 Brownl. & G. 180, 2 Brownl. & G. 297, and in Morse and Well's Case, in 13 Coke, 65, upon the ground that the common was severable, and belonged to each portion of the land ratably.

I have dwelt somewhat upon these cases of apportionment, because they were greatly relied upon at the bar in the argument. But I cannot say that they have any very forcible application to the present case, because they are either distinguishable from the present case in their circumstances, or stand upon grounds of reasoning, often obscure, and subtle, and unsatisfactory; or because, admitting their authority, they proceed upon the ground that, in general, apportionment is not allowed in contracts by the mere acts of the party, although it may be by act of law; and therefore they rather stand as exceptions, than as illustrations of a general principle, to be applied by analogy to other cases. The cases of rent service are admitted by the authorities to stand upon a peculiar ground, resulting from the feudal law and feudal tenures, and are unquestionably exceptions to the general doctrine. What I proceed upon is, that every conveyance of this sort must be decided upon its own terms and objects, and that it is very clear that no apportionment or division of the license or privilege can be made, if it is contrary to the true intent and meaning of the parties in the conveyance.

It is said that the present conveyance is the grant of an interest and right and property; and, therefore, it is divisible in its own nature. It is unnecessary to dispute about terms; but if I were called upon to characterize the present grant, I should rather call it an authority, or license, coupled with an interest in its execution. It seems to me, not so much a property or interest in rem, as a right of user for the benefit of the licensee. It is like a right of way granted to a man for him and his domestic servants to pass over the grantor's lands. Many cases have been put at the argument to sustain the views of the counsel for the plaintiff. But in my judgment, they are all distinguishable from the present case; and perpetually admonish us of the truth of the maxim, "Nullum simile est idem." This, it is said, that if I buy as many bricks from a kiln as two horses can haul in an ordinary wagon, or as one mason can lay on the wall of my house in a day, it is a valid sale of the quantity of bricks when ascertained. Certainly it is; but then it is a valid sale of the bricks as property, not the sale of the mere privilege to manufacture bricks at my kiln. So, it is asked, if the owner of a brick-yard sells to A. the right of making as many bricks on any land, as six men can strike in a day, whether it may not make a valid sale to a third person of all, that one man can strike? Certainly he may; but then he sells the ascertained quantity of bricks; and not the right to make them. So, in the case at bar, Brown might well sell to any person or persons all or any undivided portion of the matches made by him under his license; but that would be a very different thing from a sale of a fraction of the privilege to make them. The case of the sale of timber to be cut off lands in Maine, is of the same nature as those already stated. The sub parties purchase the timber when cut, not the privilege of cutting it. But, suppose the owner grants to A. the privilege of cutting timber off of his land, with the assistance of four men employed by him, can he sell the license and right of employment to each of four men in severalty for one man's share? That would be very near the present case. But can we, by any straining, declare that a license to A. to employ his four servants on my land, is a license assignable to B. to employ his four servants? Or if assignable,

would A. have a right to assign the right to employ one servant to B., another to C., and another to D. in severalty? Now, that is the very hinge of the case at the bar. It was the very point in Lord Mountjoy's Case, in Godb. 17. We all know that an authority granted to A. cannot be assigned or executed by B. A fortiori it is not apportionable, so that a part may be executed by B., and a part by C., and a part by D., and the residue by A.

Upon the whole, I retain the opinion that the license in this case was an entirety, and incapable of division, or of being broken up into fragments in the possession of different persons. The right granted is to the grantee and six persons to be employed by him in making matches; and if it be assignable, the assignment must be of the entirety of the license to the assignee, and it cannot be apportioned among different persons in severalty. It has been suggested, that, whatever may be the case at law, the plaintiff has an equitable right, which the court ought to enforce. The short answer to this is, that the plaintiff has no equity, as against Byam and the other defendants, to do an act, for which he had no authority, or to exercise a right never assignable to him. If he has any equity, it is against Brown, and not against the defendants. The bill, therefore, must be dismissed; but the question of costs will be reserved, if the parties desire it.

[NOTE. For other cases involving this patent, see note to Byam v. Farr, Case No. 2,264. For argument and decision on the reserved question of costs, see Id. 1,949.]